**Complaint of SUN SCHIFFAHRTS G.M. B.H. & CO., K.G. Owner of the Motor Tanker SOUTHERN SUN, and Sun Overseas Transport, Ltd., as Bareboat Charterer, for Exoneration from and Limitation of Liability.**

**Civ. A. No. 76–3932.**

United States District Court, E.D. Pennsylvania.

Sept. 19, 1984.

Alfred Kuffler, Philadelphia, Pa., for petitioners.

James F. Young, Philadelphia, Pa., for respondents.

## MEMORANDUM OF DECISION

SHAPIRO, District Judge.

### INTRODUCTION

Petitioners, Sun Schiffahrts, G.m.b.H. & Co., K.G., German owners of the motor tanker Southern Sun, a Liberian flag vessel, and Sun Overseas Transport, Ltd., a Liberian corporation (owned by a Delaware Corporation) (collectively "Sun"), brought this action as bareboat charterer for exoneration from and limitation of liability pursuant to 46 U.S.C. § 183 *et seq.* The tanker, chartered by Sun Oil Corporation of Pennsylvania, was carrying Libyan crude oil purchased by Sun Oil Trading Co. from the National Oil Company of Libya ("NOC") and delivered at Es Zueitina, Libya; it washed aground in a violent storm while attempting to unmoor from an offshore oil terminal located at Es Zueitina. Defendant Occidental of Libya, Inc. ("Oxy"), a Delaware Corporation, operator of the terminal and co-owner together with NOC as transferee of the Government of Libya, filed a claim against Sun for alleged damage to its equipment and facility. Sun counterclaimed against Oxy for damage to the Southern Sun and its cargo.

The trial has been trifurcated. Phase I considered these issues: a) choice of law; and b) the validity and meaning of a document called a Tanker Loading Advice ("TLA") proffered by Oxy as a condition to berthing at the terminal and signed on behalf of Sun. Oxy claims the TLA not only prevents Sun from recovering damages for Oxy's negligence but also allows Oxy to recover damages from Sun, even if caused by Oxy's culpable conduct; after determining the validity and construction of the TLA as to exemption from liability and indemnification the issues of comparative negligence of the parties and amount of damages remain to be tried.

For the reasons stated below, the court finds that: a) the law of Libya determines the validity and meaning of the TLA; b) the TLA is a valid contract; c) the provision that its terms and conditions are construed in accordance with English law is a valid choice of law; d) by the terms of the TLA, Paragraphs 2 and 3 exempt Oxy from liability; and e) Paragraph 4 cannot be construed to require Sun to indemnify Oxy for Oxy's negligence. Therefore, on the trial of liability in Phase II Sun will be denied recovery for any damage resulting from the advice or assistance of the Mooring Master or the services of mooring launches, personnel or furnishing of gear under his supervision and control. Whether Sun or Oxy recovers from the other must now be determined by trial of the issue of the comparative negligence of the parties in causing their loss or damage. The trial of Phase III on the amount of loss or damage and the applicability of the Limitation of Liability Act will follow.

### FINDINGS OF FACT

1. Petitioner Sun Schiffahrts G.m.b.H. & Co., K.G., a German partnership (consisting of a corporation serving as a general partner, Sun Schiffahrts, G.m.b.H., and Sun Schiffahrts, K.G., a partnership of individual citizens), at all material times owned the oil tanker Southern Sun. Both Sun Schiffahrts, G.m.b.H. and Sun Schiffahrts, K.G. were formed and registered under the laws of Germany.

2. Petitioner Sun Overseas Transport, Ltd. is a Liberian registered corporation. Sun Overseas Transport, Ltd. was owned at all material times by Marine Investment Company of Delaware, a Delaware corporation, which in turn was wholly owned by Sun Company, Inc., a Pennsylvania corporation. Sun Company, Inc. produces and markets refined petroleum products, including Sunoco gasoline.

3. On January 29, 1971 Sun Overseas Transport, Ltd. entered into a contract entitled "Time Charter Contract" with Sun Schiffahrts G.m.b.H. & Co., K.G. for the use of the Southern Sun which was still under construction in Bilbao, Spain.

4. Defendant Occidental of Libya ("Oxy") is a corporation registered under the laws of the State of Delaware, with its

**54**

principal place of business and base of operations in Libya.

5. At all material times Oxy owned a 49% interest in a tanker terminal at Es Zueitina, Libya; the National Oil Company of Libya ("NOC"), as transferee of the Government of Libya owned a 51% interest, following nationalization in 1973. Oxy operated the terminal.

6. Oxy is a subsidiary of both Occidental Petroleum Corporation and Occidental Oil and Gas Corporation, both of which are incorporated in the United States and maintain offices within the United States.

7. All physical assets of Oxy were located in Libya during the relevant time period.

8. Sun Oil Trading, Ltd., is a Bermuda company and a wholly owned subsidiary of Sun Company, Inc.

9. Sun Oil Trading, Ltd. acquires foreign crude oil to supply Sun Company, Inc.'s domestic United States refineries.

10. In June, 1975, Sun Oil Trading, Ltd. entered into a three-year contract with NOC to purchase 15,000 barrels a day of crude oil from Libyan oil fields.

11. Sun Oil Transport, Ltd., sold all of this crude oil to Sun Oil Corporation of Pennsylvania, a wholly owned subsidiary of Sun Company, Inc., both of which are Pennsylvania corporations.

12. Sun Oil Corporation of Pennsylvania chartered the Southern Sun to supply its refineries, principally those in Puerto Rico and Marcus Hook, Pennsylvania. As charterer, Sun Oil Corporation of Pennsylvania nominated the Southern Sun to load approximately 240,000 barrels of crude oil purchased from NOC by Sun Oil Trading, Ltd. during the period November 18, 1976 to November 22, 1976.

13. The Southern Sun arrived at the port of Es Zueitina on November 18, 1976.

14. Prior to berthing, a Mooring Master, Captain Smith, boarded the Southern Sun.

15. Captain Smith was an employee of Oxy at all relevant times.

16. Upon boarding Captain Smith presented a Tanker Loading Advice ("TLA") letter, a form prepared by Oxy, to the Master of the Southern Sun, Captain Bertacca, and requested that it be signed.

17. Captain Bertacca signed that he accepted and agreed to the TLA; the text of this document was as follows:

TANKER LOADING ADVICE

The Master
M.V. <u>Southern Sun</u>                Zueitine, _____

Dear Sir:

The bearer of this letter is our Mooring Master. Your vessel has been scheduled to moor in <u>Bravo</u> berth at <u>0730</u> hrs. on <u>22/11/76</u> subject to such vessel being ready in all respects to fulfil (sic) the requirements laid down in "OCCIDENTAL OF LIBYA INC., PORT INFORMATION AND RULES". (sic) Notice of readiness will be accepted in accordance with the aforesaid rules. You agree that such tanker, its equipment, machinery, lines and gear are in the necessary condition to properly perform loading services required.

The services of the Mooring Master are provided upon the express understanding and condition that when any Mooring Master furnished by OCCIDENTAL goes on board a tanker for the purpose of assisting such tanker he becomes for such purpose the servant of the Owner or Charterer of the tanker, and OCCIDENTAL shall not be liable for any damage or injury resulting from the advice or assistance given or for any action taken by such Mooring Master while aboard or in the vicinity of the assisted tanker.

Similarly, the services of the mooring launches and mooring personnel and the furnishing of hosing-up gear are under the supervision and control of the Mooring Master, and OCCIDENTAL skall [sic] not be liable for any damage or injury resulting from the performance of these additional services or furnishing of equipment during the period in which they are utilized by your vessel.

The users of any premises or property of Occidental [sic] shall indemnify and/or hold harmless OCCIDENTAL, its parent, any subsidiary, and/or affiliated companies for/from any and all claims, expenses, costs, causes of action, liabilities, losses or damages of any nature whatsoever arising out of and during the period the premises and/or property is used, from whatsoever cause, including any damage caused to OCCIDENTAL'S premises or property by the above named vessel.

OCCIDENTAL in no way warrants that the premises, property, machinery, equipment or gear made available to the user is devoid of defects or that it is fit for the service to which it is put.

The terms and conditions of this Loading Advice shall be construed in accordance with English Law.

Kindly acknowledge receipt of this letter by signing and dating a copy of this Tanker Loading Advice and returning it to the Mooring Master.

ACCEPTED AND AGREED TO:

| /s/ Bertacca | 22/11/76 | /s/ Luis Ruiz |
|---|---|---|
| Master | (Date) | Marine Superintent |
| | | Capt. LUIS RUIZ |

18. The Southern Sun was berthed on November 22, 1976 and began loading cargo.

19. Cargo loading was completed on November 23, 1976 and unmooring operations commenced on that date.

20. The weather at the port affected the unmooring. The exact weather conditions and the timing of events related to the unmooring remain at issue; in Phase I of this trifurcated trial, the parties have not presented evidence regarding the relevant weather conditions. However, the parties agree that during the unmooring operations the wind speed increased and the seas became rougher.

21. The vessel ran aground on November 23, 1976.

22. The cargo loaded on the Southern Sun was part of the crude oil purchased by Sun Oil Trading, Ltd. from NOC under the terms of a Crude Oil Sale Contract dated June 8, 1975.

23. All meetings concerning the negotiation and execution of the Crude Oil Sale Contract occurred in Tripoli, Libya.

24. The Crude Oil Sale Contract was principally negotiated for Sun Oil Trading, Ltd. by an employee of Middle East Sun Oil Company, a Lebanese corporation, Mr. Alan S. Ahmad, who was paid by Sun Oil Trading, Ltd. The contract was principally negotiated on NOC's behalf by Mr. Ahmed Ferjani.

25. The Crude Oil Sale Contract was the product of negotiation between Sun Oil Trading, Ltd. and NOC; the only provision not negotiable was the oil price set by OPEC. Various changes to the contract were proposed by Sun and some were accepted by NOC.

26. Among the terms of the contract under the heading "Article 7. Delivery:" were:

7.1 Such delivery of crude oil shall be made in bulk to BUYER free on board (FOB) tank vessels to be provided by BUYER and to be loaded at (ZUEITINA) loading terminal.

7.2 Port dues, expenses and all other charges for the berthing and unberthing of the tanker shall be borne and settled by the BUYER. All expenses pertaining to the operation of loading the oil, from shore tanks to the tanker, shall be borne by the SELLER.

7.3 The BUYER declares his full knowledge of the general conditions and facilities of the loading port and more particularly of the loading conditions and facilities of the particular oil sold under this Contract.

27. There was an annex, made a part of the contract under Article 8 of the contract, that provided:

ARTICLE 2. LOADING CONDITIONS AND DEMURRAGE:

2.1 SELLER shall provide tankers a safe loading berth at the port of loading if their arrival is in accordance with the lifting program mutually

agreed upon. If the arrival of the tanker is delayed, the loading shall start soon after the loading of any other tankers (already arrived in port) is terminated, and laytime shall count as from actual time of loading.

If the vessel tenders for loading on a date earlier than the estimated time of arrival and other vessels are loading, or about to load, the vessel shall await its proper turn and laytime shall not commence until loading commences or at 06:00 a.m. hours local time on the estimated time of arrival whichever first occurs. Vessel shall clear berth as soon as loading is completed.

28. In negotiating the Crude Oil Sale Contract no effort was made by Sun Oil Trading, Ltd. to determine the actual conditions of the Es Zueitina facility.

29. Prior to execution of the Crude Oil Sale Contract neither Mr. Ahmad nor any other Sun representative involved in negotiating the Crude Oil Sale Contract visited or asked to inspect the Es Zueitina facility.

30. No request for information was refused by NOC during the Crude Oil Sale Contract negotiations between NOC and Sun Oil Trading, Ltd.

31. Prior to the execution of the contract the Crude Oil Sale Contract terms relating to tanker loading were referred to Sun's Operation Department to determine if it had any problem with these contractual terms.

32. The Crude Oil Sale Contract was reviewed by Sun Oil's Legal Department.

33. The Crude Oil Sale Contract allows for arbitration before the ITC in Paris, France, but this arbitration procedure with respect to the Crude Oil Sale Contract has not been invoked by any Sun entity.

34. Oxy was not a party to the Crude Oil Sale Contract between NOC and Sun Oil Trading, Ltd.

35. At no time was any representative from Oxy present at any meeting between representatives of NOC and/or Sun Oil Trading, Ltd. to negotiate the Crude Oil Sale Contract.

36. During the negotiation of the Crude Oil Sale Contract neither party disclosed nor inquired about Oxy's TLA letter or Oxy's Port Information and Rules booklet containing a blank TLA letter.

37. Oxy's TLA letter was not incorporated in the Crude Oil Sale Contract.

38. Under a 1973 Nationalization Decree, Libya acquired 51% of Oxy's assets, including the Es Zueitina terminal and port facilities. An undivided interest in these assets was then transferred by Libya to NOC. Under Libyan law, Oxy's operations came under the supervision of a three-man management committee; two members were appointed by NOC and one by Oxy.

39. The port of Es Zueitina was described in a reference manual for seamen entitled "Sailing Directions for the Eastern Mediterranean." It stated that Oxy's booklet, "Port Information and Rules," was essential for all tankers calling on that port. This booklet contained a blank TLA.

40. The Master of the Southern Sun testified that he read the Oxy Es Zueitina Port Information and Rules booklet prior to arriving at Es Zueitina in November, 1976 and was familiar with its contents and requirements.

41. The Mooring Master took the TLA and other documents with him on boarding a vessel and delivered them to the Master of the vessel.

42. The Mooring Master was instructed that the TLA must be signed by the Master before Oxy would permit the vessel to berth.

43. The Mooring Master was not authorized to negotiate or accept any changes in the TLA.

44. If a vessel's Master refused to sign the TLA, the Mooring Master was instructed to inform the marine office to advise Oxy's Terminal Superintendent.

45. It was the understanding of Captain Clayson, Oxy's Deputy Terminal Superintendent in November, 1976, that Oxy would not berth a ship until the TLA was signed and that the TLA could not be modified.

46. Captain Clayson was not aware of any Master who refused to sign the TLA.

47. Mr. James Patten, acting Law Department manager for Oxy in November, 1976 who had responsibility for, *inter alia*, negotiating contracts for Oxy, was not aware of anyone who had asked for changes in the TLA.

48. The policy of Oxy in November, 1976 was that all terms of the TLA were negotiable.

49. In November, 1976, there was no contract between Sun and Oxy regarding the Southern Sun other than the TLA.

50. On no occasion did a Sun organization representative or Master of a Sun vessel attempt to modify or change a term in the TLA before the Master of the Southern Sun signed it on November 22, 1976.

51. No request to negotiate the TLA for Southern Sun was received by Oxy in November, 1976.

52. The Master of the Southern Sun in November, 1976 had signed TLAs without protest on at least six previous occasions when calling at Es Zueitina.

53. NOC has signed TLAs when its vessels have used Oxy's Es Zueitina facilities.

54. There was no written or verbal agency agreement between NOC and Oxy.

55. There were no NOC employees at the Es Zueitina facility in November, 1976.

56. No reports relating to the amount of cargo loaded at the Es Zueitina terminal were sent to NOC.

57. Oxy not NOC trains personnel at the Es Zueitina terminal.

58. Oxy would not recognize a stop order from NOC for Oxy cargo. Oxy recognized stop orders from NOC only for NOC designated cargo.

59. The management committee of the NOC issued no guidelines regarding Oxy's operation of the Es Zueitina facility.

60. AGIP, S.p.A. ("AGIP"), an Italian corporation, operated an oil facility in Libya during the relevant time period. AGIP is not a party to this suit.

61. In 1971, Oxy contracted with AGIP to store crude oil transported from the AGIP oil concession. This contract (entitled "Crude Oil Transportation Agreement") provided for pipeline movement of crude oil to ships and did not provide for ships' berthing or piloting. No Sun entity was a party to this contract or participated in the negotiation of this contract.

## DISCUSSION

Phase I of the trial addressed three issues:

1) the choice of law to be applied;

2) the validity of the TLA; and

3) the construction of the TLA.

### Choice of Law

This is a petition under the Limitation of Liability Act, 46 U.S.C. § 183 *et seq*; the court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1333. The court must first determine whether United States law or some foreign law should be applied. Not only the United States, but Libya, Liberia, Germany and Great Britain all might have an interest in this controversy. The court finds that the law of Libya applies and under Libyan law the TLA is construed in accordance with English law.

The factors to be weighed in choosing the choice of law applicable to a maritime matter are:

1) the place of the wrongful act;

2) the law of the ship's flag;

3) the allegiance or domicile of the injured party;

4) the allegiance or domicile of the defendant;

5) the place of contract;

6) the inaccessibility of a foreign forum; and

7) the law of the forum.

*Lauritzen v. Larsen*, 345 U.S. 571, 582–92, 73 S.Ct. 921, 928–33, 97 L.Ed. 1254 (1952) (Jones Act, 46 U.S.C. § 688, did not cover injuries sustained by a foreign seaman while on board a foreign vessel in foreign waters); *Romero v. International Termi-*

*nal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959) ("[t]he broad principles of choice of law and the applicable criteria of selection set forth in Lauritzen were intended to guide courts in the application of maritime law generally"). The *Lauritzen* test "is not a mechanical one ... [and] the list of seven factors ... was not intended as exhaustive.... [T]he shipowner's *base of operations* is another factor of importance in determining whether the Jones Act is applicable; and there well may be others." *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252 (1970) (emphasis in the original).

■ These factors guide a court in examining the realities of the matter to determine which nation has the most significant contacts. A court "should determine the substantiality of the links to the United States and the links to the foreign sovereignty. This process is undertaken in order to discern in whose 'domain' the paramount interest lies." *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240, 1246 (3d Cir.1980) (Jones Act not applicable). Here, although some contacts exist with other nations, under a *Lauritzen-Rhoditis* analysis the most significant and substantial contacts are with Libya.

The acts which gave rise to the action occurred in Libya; the Southern Sun ran aground in a Libyan port. Damage was caused was to the ship, its cargo, and to Oxy's offshore berthing facility, all located in Libyan territorial waters. The negligence alleged by petitioners was that of Oxy personnel located in Libya. The TLA was presented to and signed by the Master of the Southern Sun while in Libyan waters. Oxy is incorporated in the United States but its base of operations was in Libya during the relevant time period. Therefore, the most substantial contacts were with Libya.

■ Sun argues that United States law should apply because of the United States domicile of shareholders and directors of various corporate entities related to Sun and Oxy. The owner of the Southern Sun,

Sun Schiffahrts G.m.b.H. & Co., K.G., is a German partnership and Sun Overseas Transport Ltd. is a Liberian corporation. Oxy is incorporated in Delaware; it is a subsidiary of Occidental Petroleum Corporation and Occidental Oil and Gas Corporation, incorporated in the United States, but it operated solely in Libya and the acts for which it may be found liable occurred in Libya. Ownership of stock by a parent company located or incorporated in the United States is not a sufficient contact for the application of United States law. *De-Mateos v. Texaco, Inc.,* 562 F.2d 895, 902 (3d Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978). The allegiance and domicile of the parties not their parents are the appropriate factors to consider.

■ The ship's flag, the inaccessibility of a foreign forum and the law of the forum have been considered. No party has suggested that the Southern Sun's Liberian flag has any significance here; "in recent years a practice has grown ... to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries." *Lauritzen,* 345 U.S. at 587, 73 S.Ct. at 931. The inaccessibility of a foreign forum is not a weighty factor because this court was able to hear evidence and apply Libyan law. The law of the forum is given little weight unless the foreign law violates a strong public policy of the forum. *Lauritzen, supra* at 591 n. 27, 73 S.Ct. at 933 n. 27. "The purpose of a conflict-of-laws doctrine is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum." *Lauritzen,* 345 U.S. at 591, 73 S.Ct. at 932. No demonstrable public policy of the forum has been affronted by applying Libyan law in the circumstances of this case. Under the law of the forum as well as Libya, the TLA is a valid contract and the TLA provision that it should be construed in accordance with English law would be given effect. Therefore, the choice of Libyan law over that of the United States makes little if any difference but

analysis of the relevant factors leads to the conclusion that the law of Libya determines the validity of the TLA.

## The Validity of the TLA

There are two issues: first, whether the TLA is a valid contract under Libyan law and second, if the TLA is a valid contract, whether the parties' choice of English law should be given effect. The court finds that the TLA was a valid contract and it should be construed in accordance with the law of England as it provides.

The court heard testimony on Libyan law from three witnesses called by the parties, Mr. Omar Tarhuni for Oxy and Dr. Jamal Nasir and Mr. Sami El-Falahi for Sun, and received in evidence portions of Libyan statutory law. Generally the Libyan law of contracts is similar to the common law of contracts in the United States. Witnesses for both sides agreed that under Libyan law the requirements of a valid contract are: 1) the capacity of the parties to contract; and 2) the consent of the parties. (Deposition of El-Falahi at 215; Tarhuni N.T. at 332). Each testified to a third requirement. Mr. El-Falahi testified that there must be a "serious intention" to bind the two parties, a concept similar but not identical to consideration. Mr. Tarhuni testified that the obligations of a contract also must not be contrary to law, (Tarhuni N.T. at 332); that corresponds to the American common law proscription against contracting to do that which is illegal. *See generally* Restatement, Second, Contracts § 178 (1981).

■ The TLA was a valid contract under Libyan law. The parties had the capacity to enter into a contract. Both Captain Bertacca, Master of the Southern Sun, and Captain Luis Ruiz, Oxy's marine superintendent, were of legal age on the date of execution of the TLA and had the capacity to contract. Under Article 96 of the Libyan Maritime Law, the owner of a ship is bound by the contracts executed on its behalf by the ship's Master. (Tarhuni N.T. at 282).

Captain Bertacca's consent to the TLA was not obtained illegally. Oxy's Mooring Master, Captain Smith, boarded the Southern Sun upon its arrival in port and presented the TLA to Captain Bertacca for his signature. Captain Bertacca did not protest, negotiate, or ask to contact his superiors prior to signing; he signed the TLA without objection or comment. He was familiar with the TLA.[1] Captain Bertacca testified that he read the Es Zueitina Port Information and Rules booklet and had it almost committed to memory (Deposition of Bertacca at 2.99); the booklet contained a TLA form. Captain Bertacca had signed TLAs at Es Zueitina without protest on at least six previous occasions, but neither he nor any representative of Sun attempted to negotiate the terms of this TLA prior to signing it. Captain Bertacca's signing the TLA was a valid consent to its provisions that was binding on Sun.

Sun's argument that Captain Bertacca did not freely consent to the TLA because he had no choice (Sun's Brief at 39) is without merit. Captain Bertacca was under no physical or other compulsion to sign the TLA. The Southern Sun was not in distress requiring immediate berthing; the ship was in shape when it arrived at Es Zueitina.[2] The Oxy Mooring Master was instructed to have the TLA signed before berthing the Southern Sun, but there is no evidence that he forced Captain Bertacca to sign.

---

1. There is a presumption under Libyan law that a reasonable person would read that which purports to be a contract before signing it. (Tarhuni N.T. at 336). That presumption is consistent with the evidence.

2. Even if the Southern Sun were in distress, it is doubtful that this would have coerced Captain Bertacca into signing a contract against his will just to secure berthing. Oxy Exhibits show that the Es Zueitina facility was nothing more than an open berthing place along the coast of Libya. *See* Macht Deposition Exhibit 5A–C ("Sailing Directions for Eastern Mediterranean"). It was not a protected harbor which could have offered sanctuary to a distressed vessel. The Southern Sun could have received the same protection anchored anywhere along the coast.

Sun argues that the TLA requests a signature only to acknowledge receipt of the letter. Sun's Brief at 38. *See* Findings of Fact No. 17. The phrase "[k]indly acknowledge receipt of this letter by signing," Finding of Fact No. 17, alone might suggest that signing acknowledged receipt not agreement to its terms. However, in capital letters just above the signature line appear the words, "ACCEPTED AND AGREED TO." Findings of Fact No. 17. Considering the TLA as a whole it is clear that signing was acceptance of the contract terms stated therein.

But Sun argues that the TLA is a contract of adhesion. Sun's Brief *passim.* Sun's Libyan law witnesses contradicted each other on the concept of adhesion under Libyan law. *See* Nassir Deposition at 6970; El-Falahi Deposition at 110–11. It is assumed that Libyan law recognizes such a concept; an unofficial translation of the Libyan Civil Code contains the following:

Article 149 LEONINE CONDITIONS IN CONTRACT OF ADHESION

When a contract of adhesion contains leonine conditions, the Judge may modify these conditions or relieve the adhering party of the obligation to perform these conditions in accordance with the principles of equity. Any agreement to the contrary is void.

El-Falahi Deposition, Exhibit 4C (copy of ANSELL and IBRAHIM, THE LIBYAN CIVIL CODE, p. 31). While a contract of adhesion is undefined, it is clear such a contract is voidable but not void.[3]

Sun claims that the "terms of the [TLA] are a clear violation of the duties and obligations imposed on Oxy under the Libyan Petroleum Law." Petitioners' Brief After Trial Phase I at 36. Because the Petroleum Law, Article 11, required a concession holder [to] "diligently prosecute all his obligations under the concession in a *workmanlike manner* . . . .," *id.* at 37 (emphasis in original), and Oxy was a concession

holder, Sun contends that a TLA relieving Oxy of liability violated Libyan law. But the TLA did not require Oxy to operate the facility in an *unworkmanlike* manner; it precluded users of the facilities from holding Oxy liable for any loss or damage. It also denied any warranties by Oxy concerning the equipment or premises. This was not contrary to Libyan law.

The witnesses differed on Libyan contract law regarding consideration for a valid contract. Mr. Tarhuni testified that a contract with unilateral obligations could be binding. (Tarhuni N.T. at 332–34). Mr. El-Falahi testified that a third element of a valid contract is a "certain kind of serious intention to bind the two parties." (Deposition of El-Falahi at 215). In his explanation of "serious intention," Mr. El-Falahi attempted to distinguish between gratuitous promises (gifts) and binding promises (contracts), a *quid pro quo* similar to the concept of consideration. The court assumes that Libyan law required consideration for a binding valid contract and finds there was such consideration for the TLA. Each party provided something to the other.

In exchange for Sun's agreement to the TLA, Oxy agreed to provide the use of Oxy's facilities by the Southern Sun, and the services of the Mooring Master, mooring launches and other mooring personnel. Sun contends that these cannot be valid consideration because Oxy had a pre-existing duty to berth and load the Southern Sun. The pre-existing duty allegedly arose because the Southern Sun was a third-party beneficiary of two contracts: a contract entitled "Crude Oil Sale Contract" between Sun Oil Trading Ltd. and NOC (Findings of Fact Nos. 10–12); and a contract entitled "Crude Oil Transportation Agreement" between Oxy and AGIP. (Findings of Fact Nos. 60, 61).

■ Sun argues that under the terms of the Crude Oil Sale Contract Oxy as the

---

3. Under American law, the TLA would be considered a contract of adhesion only if it were determined that Sun had no real opportunity to negotiate the TLA or little bargaining power at the time. *See Williams v. Walker-Thomas Furniture Company,* 350 F.2d 445 (D.C.Cir.1965); Restatement, Second Contracts § 208 (1981).

agent of NOC was under a duty to berth and load the Southern Sun. NOC owned 51% of Oxy's assets but Oxy was not a party to the Crude Oil Sale Contract. Oxy did not participate in its negotiation and Oxy is not mentioned in the contract. Nowhere in the contract was an intent expressed to benefit either the owners or operators of the Southern Sun. The contract stated that the crude oil would be delivered at Es Zueitina (Findings of Fact No. 26) but it also stated that all charges and expenses for berthing were to be paid by the buyer, Sun Oil Trading, Ltd. An annex to the contract stated in part that NOC should provide a safe berth at the port of loading (Findings of Fact No. 27). If NOC did not comply with this term of the contract, Sun might have a cause of action against NOC but not against Oxy who was not a party to that contract.

Oxy was not an agent of NOC because NOC owned 51% of Oxy. Although NOC was its principal stockholder, Oxy and NOC were separate corporate entities. Oxy operated the terminal independently of NOC (Findings of Fact Nos. 53–59) and required NOC to sign TLAs when its vessels used Oxy's facilities. (Findings of Fact No. 53). There is no basis for piercing corporate veils.

Oxy was a party to the Crude Oil Transportation Agreement but Sun was not. This agreement between Oxy and AGIP, an Italian corporation operating an oil facility in Libya, provided for the transportation of oil from AGIP's inland facility to Oxy's facility for loading on ships. This contract was entered into in 1971, several years before Sun contracted to purchase oil from NOC; nowhere in this contract was there expressed an intent to benefit Sun.

Sun attempts to benefit from these two contracts but neither contract obligated Oxy to berth the Southern Sun. Oxy was under no pre-existing duty to berth the Southern Sun; the TLA was its contract with owners and operators for the use of its facility. By providing the assistance of its personnel and the use of its facility, Oxy gave consideration for the TLA; all requirements for a valid contract were satisfied.

■ The TLA provided that its terms and conditions should be construed in accordance with English law (Findings of Fact No. 17). Under Article 19 of the Libyan Civil Code contracts are governed by the law of the domicile when such domicile is common to the contracting parties. In the absence of common domicile the contract is governed by the law of the place where the contract was concluded. These provisions are not applicable if the parties agree to apply another law or the circumstances indicate that they intended to do so. Under this Article, the parties are allowed to choose foreign law either explicitly or implicitly unless the terms or the provisions of the foreign law are contrary to public order or morality. Choice of English law was not contrary to Libyan public policy. At the time of the events at issue, it was common that maritime matters, especially charter agreements, were construed under English law;[4] Tarhuni N.T. at 257–259. The choice of English law provision in the TLA was valid and the terms and conditions of the TLA are therefore construed in accordance with English law.[5]

---

4. Libya was under British administration after the Second World War and most circulars or law relating to ports and maritime affairs were issued by the British Military government of Libya at that time. All the maritime regulations applied in Libya until 1970 were regulations issued under British administration.

5. Choice of law provisions in international commercial contracts are given effect in the United States. *See Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 516, 94 S.Ct. 2449, 2455, 41 L.Ed.2d 270 (1974).

In *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972), the Supreme Court held that federal district courts sitting in admiralty should find a choice of law *prima facie* valid unless enforcement is unreasonable and unjust or the clause is invalid for fraud or overreaching; the Court acknowledged that the courts of England met the necessary standards of neutrality and long experience in admiralty litigation. It enforced a choice of English forum even though it appeared likely that an English court would en-

*Interpretation of TLA*

The Southern Sun was scheduled to moor subject to the terms of the TLA. Paragraphs 2, 3 and 4 of the TLA provided as follows:[6]

The services of the Mooring Master are provided upon the express understanding and condition that when any Mooring Master furnished by OCCIDENTAL goes on board a tanker for the purpose of assisting such tanker he becomes for such purpose the servant of the Owner or Charterer of the tanker, and OCCIDENTAL shall not be liable for any damage or injury resulting from the advice or assistance given or for any action taken by such Mooring Master while aboard or in the vicinity of the assisted tanker.

Similarly, the services of the mooring launches and mooring personnel and the furnishing of hosing-up gear are under the supervision and control of the Mooring Master, and OCCIDENTAL skall [sic] not be liable for any damage or injury resulting from the performance of these additional services or furnishing of equipment during the period in which they are utilized by your vessel.

The users of any premises or property of Occidental [sic] shall indemnify and/or hold harmless OCCIDENTAL, its parent, any subsidiary, and/or affiliated companies for/from any and all claims, expenses, costs, causes of action, liabilities, losses or damages of any nature whatsoever arising out of and during the period the premises and/or property is used, from whatsoever cause, including any damage caused to OCCIDENTAL'S premises or property by the above named vessel.

Two issues arise: 1) do paragraphs 2 and 3 and/or the "hold harmless" clause of paragraph 4 exempt Oxy from liability for its negligence or that of its employees; and 2) does paragraph 4 indemnify Oxy for damage caused to its property as a result of its own negligence or that of its employees.

Under the law of England, persons making a contract are free to enter into any contract they may choose and, providing the contract is not illegal or voidable, it is binding on them. (Pollock N.T. at 10, 14). Clauses excluding or modifying liability that would otherwise arise under the contract are to be construed strictly and the degree of strictness applied to their construction depends on the extent to which they depart from obligations ordinarily imposed. While it is frequently stated that the rules for interpreting exemption and indemnity clauses are the same, factual analysis of the cases demonstrates that indemnification clauses are construed more strictly against the party claiming indemnity, particularly if the indemnity is not for acts of a third party but for the negligence of the party claiming indemnification. *See* Appendix to this Memorandum.

The basic approach to such [exemption and indemnity] clauses is not in doubt. A party to a contract who wishes to exclude liability, or claim indemnity, for his own negligence or that of his servants or agents must do so in clear and unequivocal terms. The object of construction, of course, is the ascertainment of the intention of the parties, from the words that they have used, but the court starts with a presumption that parties do not normally agree to accept the consequences of each other's negligence, much less to shoulder responsibility for theirs, and will not be taken to have intended to do anything so improbable unless the

---

force an exculpatory clause that might then have been unenforceable in the United States. The Court declared that a contractual choice of forum clause should be held unenforceable only if enforcement would contravene a strong public policy of the forum in which suit is brought. *Id.* at 15, 92 S.Ct. at 1916.

**6.** Paragraph 5 of the TLA also provided:

OCCIDENTAL in no way warrants that the premises, property, machinery, equipment or gear made available to the user is devoid of defects or that it is fit for the service to which it is put.

But Sun claims damages for negligence not for breach of warranty for defective design or breach of fitness for purpose so it is unnecessary to construe this clause.

contract does not admit of any other reasonable construction.

*E Scott (Plant Hire) Ltd. v. British Waterways Board,* Court of Appeal (Civil Division) 1978 E No. 915 (1982) (Lord Justice Oliver).

What distinguishes the cases is the degree of clarity with which such an exclusion of liability or indemnity has to be expressed to be effective. The English courts have evolved guidelines for the construction of such clauses, especially in the case of carriers by sea. These guidelines were stated by the Privy Council (Lord Morton of Henryton) with regard to the law of Canada in *Canada Steamship Lines Ltd. v. The King,* [1952] A.C. 192 (P.C.) and reaffirmed as of general application by the House of Lords in *Smith and Others v. South Wales Switchgear Ltd.,* [1978] 1 All E.R. 18 (H.L.):

> (i) If the clause contains language which expressly exempts the person in whose favour it is made (hereafter called 'the *proferens*') from the consequence of the negligence of his own servants, effect must be given to that provision ... (ii) If there is no express reference to negligence, the court must consider whether the words used are wide enough, in their ordinary meaning, to cover negligence on the part of the servants of the *proferens* ... (iii) If the words used are wide enough for the above purpose, the court must then consider whether 'the head of damage may be based on some ground other than that of negligence', to quote against Lord Greene, M.R., in the *Aldersdale* case. The 'other ground' must not be so fanciful or remote that the *proferens* cannot be supposed to have desired protection against it, but subject to this qualification, which is, no doubt, to be implied from Lord Greene's words, the existence of a possible head of damage other than that of negligence is fatal to the *proferens* even if the words used are, *prima facie,* wide enough to cover negligence on the part of his servants.

*Smith, supra* at 25 (*quoting* Lord Morton of Henryton in *Canada Steamship, supra* at 208) (footnote omitted). *See also, Lamport & Holt Lines Ltd. v. Coubro & Scrutton (M. & I.) Ltd. and Coubro & Strutton (Riggers and Shipwrights) Ltd. (The "Raphael"),* [1982] 2 Lloyd's Rep. 42.

The English cases make clear that these are guidelines to construction not a statute or rule of law. "[R]ules of construction are merely our guides not our masters; in the end you are driven back to construing the clause in question to see what it means.... Nevertheless where guidance has been laid down so frequently and so authoritatively, the approach which that guidance suggests cannot simply be ignored." *E Scott (Plant Hire) Ltd., supra* (Lord Justice Oliver). It has been argued that in the absence of ambiguity the *Canada Steamship* tests do not apply but since the first test is designed to determine if a clause is on its face ambiguous, it must be assumed that the tests have the general application given to them by the House of Lords in the *Smith* case.

■ Applying these tests first to the issue whether Oxy is exempt from liability for its negligence or that of its employees, it is clear that Paragraphs 2 and 3 suffice to exempt Oxy from liability for the Mooring Master's negligence. Paragraphs 2 and 3 expressly provide,

> ... OCCIDENTAL shall not be liable for any damage or injury resulting from the advice or assistance given or for any action taken by such Mooring Master while aboard or in the vicinity of the assisted tanker.
>
> Similarly, the services of mooring launches and mooring personnel and the furnishing of hosing-up gear are under the supervision and control of the Mooring Master and OCCIDENTAL skall [sic] not be liable for any damage or injury resulting from the performance of these additional services or furnishing of equipment during the period in which they are utilized by your vessel.

The clauses fail the first test because they do not contain language expressly ex-

empting the proferens from the consequence of the negligence of his own servants. The exemptive phrases "any damage or injury" is not the use of the word "negligence" itself or any synonym such as lack of care or breach of duty. It has been clear since *Smith* that "unless the clause concerned uses the word 'negligence' or some equivalent in unmistakable and unequivocal terms, its effect falls to be tested . . . by Tests 2 and 3." *Smith, supra* at 22, 26; *E Scott (Plant Hire) Ltd., supra* (Lord Justice Oliver). Here Test 2 is satisfied because even if there is no express reference to negligence, the words "shall not be liable for any damage or injury" are wide enough, in their ordinary meaning, to cover negligence on the part of servants of the proferens.

Since the words used are wide enough for that purpose, under Test 3 the court must next consider whether the head of damage may be based on some ground other than negligence. In this case, the exemption is widely drawn to exclude liability for "advice or assistance or for any action taken by the Mooring Master while aboard or in the vicinity of the assisted tanker." It is drawn broadly enough to cover deliberate conduct and conduct so reckless as to be termed "gross" negligence, but could not reasonably be construed to exempt only such conduct to the exclusion of negligence. This interpretation is confirmed by reference to the clause preceding the exemptive language: "[t]he services of the Mooring Master . . . becomes for such purpose the servant of the Owner or Charterer of the tanker. . . ." Construing these paragraphs in context, without resort to fanciful or remote speculations, the court concludes that the parties intended that Oxy be exempt from liability for any damage or injury resulting from the advice or assistance given or any action taken by the Mooring Master while aboard or in the vicinity of the Southern Sun or from the performance of the services of the mooring launches and mooring personnel or furnishing of equipment under the supervision and control of the Mooring Mas-

ter during the period they were utilized by the vessel.

These TLA clauses refer only to the Mooring Master furnished by Oxy; when he went on board to assist the Southern Sun by virtue of the TLA he became the servant of the Owner or Charterer of the Southern Sun. Oxy is not liable for any damage or injury resulting from his advice, assistance and action while aboard or in the vicinity or resulting from the performance of the services of mooring launches, mooring personnel or the furnishing of hosing-up gear under his supervision and control. But Oxy claims exemption from liability for its own negligence, that is, for the negligence of its corporate officers as well as all of its employees. These clauses cannot be read so broadly. Indeed, Oxy conceded at trial that these Paragraphs would not exculpate Oxy from liability for its negligence in employing the Mooring Master; that is, the TLA exempts liability for an incompetent Mooring Master but not for lack of reasonable care in his selection (Pollock N.T. at 20–21).

However, Oxy relies on the provision of Paragraph 4 that users of the premises or property of Oxy shall "indemnify and/or hold harmless OCCIDENTAL . . . for/from any and all claims, expenses, costs, causes of action, liabilities, losses or damages of any nature whatsoever . . . from whatsoever cause, including any damage caused to OCCIDENTAL's premises or property" by the Southern Sun. This Paragraph is obviously directed to indemnification rather than exemption from liability but Oxy contends that the use of the conjunction "and/or" preceding "hold harmless" makes it more than an alternative or synonym and adds exemption from liability to the indemnification provisions of the paragraph. Sun argues that "hold harmless" has never had any meaning other than as a synonym for "indemnify;" the cases support its contention that "and/or hold harmless" results from the excess caution of a scrivener of the document. When construed against the proferens, as the law requires in the case of ambiguity, there is no justification for interpreting "and/or hold harmless" as

anything other than a synonym for "indemnify."

But even if "and/or hold harmless" were a grant of exemption from liability independent of Paragraphs 2 and 3, it would fail the three-pronged *Canada Steamship* test of Lord Morton approved by the House of Lords in *Smith*. First, the purported clauses of exemption do not refer specifically to negligence; in *Smith*, the majority and probably all of their Lordships clearly expressed the view that no clause which does not refer in express terms to liability for negligence or some synonym of negligence is capable of satisfying Test 1. In particular, words such as "whatsoever" or "howsoever arising" are merely words of emphasis and cannot be read as equivalent to an express reference. Nor can the phrase "and/or hold harmless" pass Tests 2 and 3 as an exclusion from liability. The cases recognize that it is improbable one party to a contract should intend to absolve the other party from the consequences of the latter's own negligence, so one does not presume one party intended to exempt the other from the consequences of its own negligence unless the contrary was expressed or clearly implied.

The terms used here not only did not expressly exclude negligence but were not primarily suggestive of negligence. "Claims, expenses, costs, causes of action, liabilities, losses or damages of any nature whatsoever ... from whatsoever cause" could include damage caused to Occidental's premises or property arising from not only the conduct of Sun or its servants but also from the conduct of third parties such as other vessels in the port, weather forecasters, etc. None of the terms used was necessarily indicative of the negligence and some were inconsistent with it. Therefore, Paragraph 4 was not intended to exempt Oxy from liability for its negligence.

■ Applying the relevant tests to the issue whether Oxy is entitled to indemnification for damage caused to its property as a result of its own negligence or that of its employees, it is clear that Paragraph 4 does not operate to permit it. The principles applicable to a clause which purports to confer exemption from liability are applicable to an indemnity clause. As Lord Slade said in *E Scott (Plant Hire) Ltd.*, *supra*, "It is inherently improbable (albeit by no means impossible) that one or two parties to a commercial contract will have agreed to absolve the other party (the 'proferens' who put forward the clause) from liability for the negligence of himself or his own servants. The court should approach the construction of all exemption and indemnity clauses from this standpoint." Viscount Dilhorne observed in *Smith, supra,* that the tests of Lord Morton in *Canada Steamship* were applied to both the exemption clause and indemnity clause therein, but although the tests were meant to apply both to exemption and indemnity clauses, "it was the view of Lord Morton that a heavier burden lay on the proferens seeking to establish that the other party to an agreement had agreed to indemnify him against liability for his negligence and that of his servants than when he is merely seeking to establish exemption from liability for his negligence."

The reasoning of the learned judge is directly applicable here, "[w]hen considering the meaning of such a clause one must I think regard it as even more inherently improbable that one party should agree to discharge the liability of the other party for acts for which he is responsible. In my opinion, it is the case that the imposition by the proferens on the other party of liability to indemnify him against the consequences of his own negligence must be imposed by very clear words. It cannot be said, in my opinion, that it has been in the present case." *Smith, supra* at 21–22.

Paragraph 4 provides that users of the premises or property of Oxy shall indemnify Oxy for/from many things but "negligence" is not one of them. Since no "negligence," is referred to expressly, neither is the negligence of Oxy. Since *Smith*, "[n]o clause which does not refer in express terms to the liability for negligence or some synonym of negligence is capable of satisfying the test. In particular, words

such as 'whatsoever' or 'howsoever arising' are merely words of emphasis and cannot be read as equivalent to an express reference." *E. Scott (Plant Hire) Ltd., supra* (Lord Justice Oliver).

Therefore, we start with the application of Test 2. The words of Paragraph 4, even construed contra proferens, are wide enough in their ordinary meaning to cover negligence on the part of the servants of the proferens. But when one applies Test 3 there are possible liabilities which the parties were likely to have had in contemplation in regard to indemnity which did not involve any negligence on the part of Oxy, the proferens, or its servants.[7]

Therefore, the head of damage may be based on some ground other than that of the proferens' negligence and the other ground is not so fanciful or remote that Oxy, the proferens, could not have desired protection from it. This under English case law is fatal to Oxy's claim of indemnity from liability for its own negligence even if the words used were *prima facie* wide enough to cover negligence on the part of its servants. To construe the contract as broadly as Oxy urges would make Sun as user of the premises or property of Oxy liable to indemnify Oxy for any loss or damage to another vessel or to its premises even if caused by Oxy's negligence or that of a third party without any fault of Sun so long as it arose during the period Sun's vessel was there. To state the proposition is to suggest the implausibility that was the intent of the parties.

It remains only to comment on some of Oxy's contentions. *Gillespie Brothers & Co. Ltd. v. Roy Bowles Transport Ltd.,* [1973] 1 All E.R. 193 (C.A.) is the only case cited to the court in which a clause imposing an obligation of indemnity was upheld; even there, the plaintiff recovered over against the defendant only sums it was required to pay to a third party for the negligence of its servant while on loan to defendant. But that decision in the Court of Appeal preceded the decision of the law Lords in *Smith.* Since *Smith,* a clause cannot expressly exempt or indemnify the proferens against his negligence unless it contains the word "negligence" or some synonym for it. "The word 'whatsoever' ... is no more than a word of emphasis and it cannot be read as equivalent to an express reference to negligence." *Smith, supra* at 26.

*Photo Production Ltd. v. Securicor Transport Ltd.,* [1980] 1 All E.R. 556 (House of Lords) is the only decision of the House of Lords subsequent to *Smith, supra,* cited in support of Oxy's claim for indemnification from its own negligence. It was held that a clear and unambiguous exception clause protected defendants from liability; the clause in question clearly contemplated negligence because a certain kind of negligence by the defendants was expressly excluded. But the issue was exemption from liability for negligence not indemnity from one's own negligence so the case is distinguishable.

*Bahamas Oil Refining Co. v. Kristiansands Tankrederie A/S and Others and Shell International Marine Ltd.,* [1978] 1 Q.B. 211 (the *"Pollyduke"*) was tried on only two issues: whether a provision for indemnity had binding effect and whether the vessel's Master had authority to bind the vessel. The construction of the indemnity clause was not contested. For the purpose of deciding the litigated issues, it was assumed that plaintiffs as well as defendants were without fault so that the decision cannot be said to countenance plaintiff's enforcing a contract requiring

---

7. The most obvious situations would be third party claims against Oxy for actions of Sun. If a third party made a claim against Oxy for damage to its vessel or cargo caused by the negligence of the Mooring Master while a servant of Sun, Oxy could call on Sun to indemnify and/or hold harmless; Oxy would not be recovering from Sun for Oxy's own negligence. But the Sun vessel itself might also cause damage to Oxy's premises or property negligently or accidentally without the negligence of Oxy. Indeed, the TLA expressly precludes warranties that the premises, property, machinery, equipment or gear are devoid of defects or fit for the service to which put. But while the TLA expressly included damages to Oxy's premises or property, it did not expressly include damages occasioned by Oxy's own negligence.

defendants to indemnify it for its own negligence. Finally, even if the opinion of a trial court were more persuasive than that of the House of Lords, the indemnity in *Polyduke* was more far reaching than in the instant case; it expressly covered not only "damage from whatsoever cause arising ... notwithstanding that such damage be contributed to or by the negligence of the company or its servant...." The latter clause is omitted from the TLA and compels the result reached herein.

The court has considered the argument that Parliament's passage of the Unfair Contract Terms Act of 1977 has removed the need for strained construction of exclusion clauses as of they were contracts of adhesion. Because this Act prevents abuse of exculpatory clauses in consumer contracts, it is argued that in the case of commercial contracts negotiated between businessmen capable of deciding how risks should be borne most economically, it is wrong to place a strained meaning on words in an exclusion clause which are clear and fairly susceptible of one meaning. This consideration may well explain the *Photo Production* case. But the TLA in suit was executed in Libya on November 11, 1976 and its proper construction cannot be affected by the subsequent passage of the Unfair Contract Terms Act.

*Photo Production* suggests that the risks involved in transactions to which exemption clauses apply are generally borne by insurance. In *Gillespie*, Lord Denning stated that it had been the common practice of carriers—by land, sea or air—to make conditions limiting their liability to specific sums and to leave the goods owner to insure if greater coverage were desired. But this reliance on insurance has greater force in considering an agreement to exempt another from liability than an agreement to indemnify the other for the other's negligence. Such insurance would not seem so common or readily available; some liability insurance has an express exclusion for another's negligence.

In *Polyduke*, Mr. Justice Kerr mentioned the resistance to unqualified acceptance of provisions that cast on shipowners all risks of loss and damage to the vessel or their owners and all liability for loss or damage to a terminal and to its occupants in connection with the vessel's use of the terminal, however such loss or damage might be caused and even if the cause might be some negligence or default on the part of the owners or occupiers of the terminal. The risks and liabilities resulting from the requirement by oil terminals to Masters to sign conditions of this nature were said to be uninsured unless covered by special rules or side-letter agreements of protection and indemnity associations known as "clubs." But there being no evidence on the insurance coverage in this case, or the customary practice at the time, the insurability of Sun's vessel against its liability for the negligence of Oxy or its servants cannot be relevant.

Finally, because Paragraph 4, properly construed, does not provide indemnification for the negligence of Oxy itself or its servants, it is not necessary to consider whether enforcement would contravene strong public policy of the forum in which suit is brought. *Cf., M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972).

### CONCLUSION

The court concludes that under United States choice of law rules, Libyan law applies to the determination of the validity of the TLA. Under Libyan law the TLA signed November 22, 1976 by an agent of Sun is a valid contract and its choice of English law applies. Under English law, the TLA exempts Oxy from any liability to Sun for the damage sustained as a result of conduct of the Mooring Master or the mooring personnel launches or equipment under the supervision and control of the Mooring Master. The TLA does not require petitioners to indemnify Oxy for losses to Oxy's premises or property caused by the Southern Sun as a result of Oxy's negligence but Sun must indemnify Oxy for such losses to the extent they resulted from other than Oxy's negligence.

# APPENDIX